# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLARET CAPITAL NOMINEES, LTD., in its own capacity and Derivatively on behalf of DEVON AD TECH, INC., CLARET CAPITAL BLADE LTD., in its own capacity and Derivatively on behalf of DEVON IT (EUROPE) LTD., <br><br> Plaintiffs, <br><br> v. <br><br> DEVON IT INC., JOHN BENNETT, JOSEPH MAKOID, DEVON AD TECH, INC., and DEVON IT (EUROPE) LTD., <br><br> Defendants. | ECF Case <br><br> Docket No.: <br><br><br> **VERIFIED COMPLAINT** |

Plaintiffs Devon AD Tech, Inc. ("Devon AD"), by and through its shareholder Claret Capital Nominees, Ltd. ("Claret Nominees"), Devon IT (Europe) Ltd. ("Devon Europe"), by and through its shareholder Claret Capital Blade Ltd. ("Claret Blade"), and Claret Nominees and Claret Blade, on behalf of themselves (collectively, Claret Nominees and Claret Blade are referred to as the "Claret entities"), and for their complaint against defendants Devon IT Inc. ("Devon IT"), John Bennett ("Bennett") and Joseph Makoid ("Makoid") state as follows:

## NATURE OF THE ACTION

1.      This is a case of oppression and self-dealing by majority shareholders.  In two separate investments, the defendants, led by the individuals John Bennett and Joseph Makoid, assigned certain contractual rights to the plaintiffs in order to obtain the Claret entities' money, only to thereafter reconfigure those contracts so that any monies go to companies owned exclusively by Bennett and Makoid and not by plaintiffs.  In both investments the defendants followed a three-step pattern: *First*, Bennett and Makoid concluded contracts with IBM on

behalf of companies exclusively owned by Bennett/Makoid; *second*, Bennett and Makoid obtained funds from the Claret entities in order to fund their performance under these IBM contracts, and in return for these funds, assigned the contracts to new entities in which both Bennett/Makoid and the Claret entities had an interest; and, *third*, once they had the Claret entities' money, they reconfigured their contracts with IBM to assure that all funds would flow only to companies owned exclusively by Bennett/Makoid. Defendants took these steps in total violation of and contempt for applicable corporate procedures concerning notice to shareholders and Board members. By so doing, defendants violated their fiduciary duties and their duty of loyalty, applicable shareholder oppression statutes, the Uniform Fraudulent Transfer Act, and existing agreements between the parties.

      2.    This conduct is memorialized in specific agreements as pleaded below and summarized in the following chart, which shows for each of the two different investments, one called the Blade Agreement and one called the Hosted Client Agreement, the evolution from a Bennett/Makoid project, to a project partially owned by the Claret entities in exchange for money provided by or through Claret entities, back to a Bennett/Makoid project once the Claret entities had invested their money:

|  | Devon IT's Original IBM Agreement | Assignment to Devon AD and Devon Europe | Provision of Claret Entities' Funds | Diversion of Funds Back to Devon IT |
|---|---|---|---|---|
| **Blade Agreement** | 10/3/05 Blade Collaboration Agreement | 12/18/06 Deed of Assignment | 12/22/06 through 10/25/07 Devon Europe Loan Notes | 7/10/08 Blade Enablement Agreement |
| **Hosted Client Agreement** | 6/7/07 Hosted Client Collaboration Agreement | 7/31/07 First Amendment to Hosted Client Agreement | 8/27/07 Shareholders Agreement and 10/27/07 Devon AD Note | 7/10/08 Hosted Client Solution Enablement Agreement |

## THE PARTIES

3.      Claret Capital Ltd. ("Claret Capital") is a private limited company that is organized and existing under the laws of the Republic of Ireland.  Claret Capital maintains an office at 150 N. Chester Road, Suite F200, Radnor, Pennsylvania.  Claret Capital is a private equity firm that invests in real estate, media and technology sectors.

4.      Claret Blade is a company incorporated under the laws of Ireland, and has a registered office at 30 Herbert Street, Dublin 2, Ireland.  Claret Blade is owned by CCL: Blade Limited Partnership, in respect of which Claret Capital is the General Partner.

5.      Claret Nominees is a corporation organized and existing under the laws of Ireland. with its principal place of business at The Oval, Block 3, Shelbourne Road, Ballsbridge, Dublin 4, Ireland.  Claret Nominees holds shares in Devon AD in trust for the beneficial owner, CCL: I-Data Plex SP Limited Partnership, in respect of which Claret Capital is the General Partner.

6.      Nominal Defendant Devon Europe is a company incorporated under the laws of Ireland having its registered office at The Oval, Block 3, Shelbourne Road, Ballsbridge, Dublin 4, Ireland.  Defendant Devon IT owns 90% of Devon Europe and Claret Blade owns the remaining 10%.  The Board Members of Devon Europe are Bennett, Makoid, Max Doyle, and Domhnal Slattery.

7.      Nominal Defendant Devon AD is a Delaware corporation organized and existing under the laws of the State of Delaware.  It has a principal place of business at 1100 First Avenue, Suite 100, King of Prussia, PA, 19406.  Devon AD was engaged in the business of designing and developing a hosted thin client product for the sale to businesses and to the public in general, pursuant to the Original Hosted Client Agreement (defined below) with IBM.

8.      Plaintiff Claret Nominees, and defendants John Bennett and Joseph Makoid, are shareholders of Devon AD, as follows:

      a.      Bennett owns 8,500,000 shares of Devon AD.

      b.      Makoid owns 1,500,000 shares of Devon AD.

      c.      Claret Nominees owns 5,000,000 shares of Devon AD.

9.      Defendant Devon IT is a Pennsylvania corporation, organized and existing under the laws of Pennsylvania, with its principal place of business at 1100 First Avenue, Suite 100, King of Prussia, Pennsylvania, 19406.  Bennett is the majority shareholder of Devon IT. Upon information and belief, Makoid owns a small percentage of shares in Devon IT.  No Claret entity holds an ownership or equity interest in Devon IT.

10.      Defendant Bennett is a citizen of the Commonwealth of Pennsylvania, residing at 1835 County Line Road, Villanova, Pennsylvania, 19085.  At all times relevant hereto, Bennett was a shareholder and director of Devon AD and Devon Europe and the principal shareholder and a director of Devon IT.

11.      Defendant Makoid is a citizen of the Commonwealth of Pennsylvania residing at 2755 Ashton Court, Doylestown, Pennsylvania, 18901.  Upon information and belief, at all times relevant hereto Makoid was a shareholder and director of Devon AD, and the President and a shareholder of Devon IT.

## JURISDICTION

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.      This Court has personal jurisdiction over the Defendants because each is a resident of the Commonwealth of Pennsylvania.

#9888908 v8

## VENUE

14.     Venue in this Court is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Pennsylvania and the Defendants are subject to personal jurisdiction in the Eastern District of Pennsylvania.

## BACKGROUND FACTS

**I.      Devon IT's Initial Agreements with IBM**

**A.      The Original Blade Agreement**

15.     In October and November 2005, Devon IT and IBM entered into a Blade Collaboration Agreement #4905RL2238 (the "Original Blade Agreement").  The Agreement is dated October 3, 2005 and was executed on or about November 7, 2005.

16.     Makoid signed the Original Blade Agreement on behalf of Devon IT as Devon IT 's President.

17.     The Original Blade Agreement sets forth Devon IT 's and IBM's agreements to fund, design, and develop a "fixed function hosted client blade server solution."

18.     The Original Blade Agreement called for royalty payments to be made to Devon IT for each Blade product that was sold by IBM.

19.     As part of the Original Blade Agreement, Devon IT agreed to pay IBM the sum of Four Million and xx/100 Dollars ($4,000,000.00).

**B.      The Original Hosted Client Agreement**

20.     On or about June 7, 2007, IBM and Devon IT entered into a "Hosted Client Collaboration Agreement" (the "Original Hosted Client Agreement") concerning a "hosted client solution" product.

#9888908 v8

21.     Bennett signed the Original Hosted Client Agreement on behalf of Devon IT as its Chief Executive Officer and Chairman.

22.     The Original Hosted Client Agreement provides that Devon IT and IBM agreed to "fund the design and development of a hosted client solution" as defined in the agreement.

23.     Pursuant to Section 16.0 of the Original Hosted Client Agreement, Devon IT agreed to make payments to IBM at various times totaling Eleven Million and xx/100 Dollars ($11,000,000.00).

## II.     Assignment of Rights to Claret Entities and the Claret Entities' Resulting Funding

### A.     Claret Blade's Funding for the Original Blade Agreement

24.     To satisfy its payment obligations under the Original Blade Agreement, Devon IT sought investors.

25.     One of the investors that Devon IT solicited was Claret Capital.

26.     Following negotiations, on August 16, 2006, Devon IT and Claret Blade entered into a Shareholders Agreement (the "Ruby Sword Shareholders Agreement") whereby Devon IT became a 90% shareholder in Ruby Sword Limited and Claret Blade held the remaining 10% of the shares.

27.     Claret Blade bought 10 shares of Ruby Sword for $10,000.

28.     Ruby Sword Limited changed its corporate name on September 11, 2006, and became Devon IT (Europe), Ltd.

29.     Under Section 4.7.1 of the Ruby Sword Shareholders Agreement, Devon IT cannot "enter into any material or onerous agreement or arrangement in relation to the Business" engaged in by Devon Europe; "terminate or notify an intention to terminate any

contract;" or "amend, assign or alter the terms of any contract," without the prior written consent of Claret Blade.

30.     Under Section 4.7.2 of the Ruby Sword Shareholders Agreement, without the approval of the Board, Devon Europe may not "amend or alter the terms of any material contract or commitment" or "approve any business development plan for" Devon Europe or "amend or deviate in any material respect from any agreed business plan."

31.     By way of a Deed of Assignment dated December 18, 2006, Devon IT assigned all its rights and obligations under the Original Blade Agreement to Devon Europe. This assignment gave Claret Blade an equity stake in the project (i.e., the Blade Agreement), which Claret Blade agreed to fund under the unsecured loan note.

32.     On December 22, 2006, Devon Europe executed and delivered to Claret Blade a Loan Note Certificate in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00), pursuant to a December 15, 2006 Redeemable Unsecured Loan Note.  The December 22, 2006 loan note was executed and delivered by Devon Europe to Claret Blade to evidence a $1,500,000.00 loan Claret Blade provided to Devon Europe at that time to provide funds to satisfy Devon Europe's obligation to IBM under the Original Blade Agreement.

33.     On October 4, 2007, Devon Europe issued a second Loan Note Certificate between Devon Europe and Claret Blade in the amount of One Hundred Eighty-Six Thousand, Seven Hundred Forty-Eight and xx/100 Dollars ($186,748).  The October 4, 2007 Loan Note Certificate was created to evidence an additional $186,748 loan that Claret Blade provided to Devon Europe to satisfy its working capital requirements at that time.

34.     On October 25, 2007, Devon Europe issued a third Loan Note Certificate to Claret Blade in the amount of Two Million Dollars ($2,000,000.00) to evidence an additional

loan that Claret Blade provided to Devon Europe to satisfy Devon Europe's obligation to IBM under the Original Blade Agreement. The December 22, 2006, October 4, 2007 and October 25, 2007 Loan Note Certificates are collectively referred to herein as the "Devon Europe Notes."

35.     Following issuance of the October 25, 2007 Loan Note Certificate, the total amount that Claret Blade funded under the Devon Europe Notes was Three Million, Six Hundred Eighty Six Thousand, Seven Hundred Forty-Eight and xx/100 Dollars ($3,686,748.00).

**B.     Claret Nominees' Funding of the Original Hosted Client Agreement**

36.     On July 31, 2007 Devon IT, Devon AD and IBM executed the First Amendment to the Hosted Client Collaboration Agreement (the "First Amendment to the Hosted Client Agreement").

37.     The amendment states that Devon IT intends for Devon AD to "perform and fulfill all of the responsibilities and obligations of Devon IT under the [Original Hosted Client] Agreement."

38.     Bennett signed the agreement on behalf of both Devon IT and Devon AD, as Chief Executive Officer and Chairman of each entity.

39.     Once again, Bennett and Makoid needed additional funds to satisfy Devon AD's obligations to IBM under the Original Hosted Client Agreement and turned to Claret Capital to obtain funds to enable Devon AD to meet its payment obligations to IBM.

40.     Consequently, on August 27, 2007, Bennett, Makoid, Devon AD, and Claret Nominees entered into the "First Amendment to Shareholders Agreement" (the "Devon AD Shareholders Agreement"). The Devon AD Shareholders Agreement, like the First Amendment to the Hosted Client Agreement, states that Devon AD is to assume the duties, obligations, and benefits of Devon IT under the Hosted Client Agreement.

#9888908 v8

41.     Section 4 of the Devon AD Shareholders Agreement articulates that agreement's narrow "Purpose." That purpose was to engage Claret Nominees "to assist and support the development, manufacture, sale, and distribution of hardware, software, products, services, or any combination thereof, for the equipment and processes described, set out, and summarized in Section 1 of the Hosted Client Agreement" including the licensed product known as the "Hosted Client Technology."

42.     Section 2 of the Devon AD Shareholders Agreement further provides that upon its execution, shares in Devon AD will be reconfirmed and issued to the following three shareholders in the following amounts: (1) Bennett 8,500,000 shares, (2) Makoid 1,500,000 shares, and (3) Claret Nominees 5,000,000 shares.

43.     Claret Nominees paid Five Thousand Dollars ($5,000.00) as the purchase price for its 5,000,000 shares in Devon AD.

44.     Section 3 of the Devon AD Shareholders Agreement provides that in exchange for the issuance of shares, Claret Nominees would make up to Eleven Million Dollars ($11,000,000.00) available to Devon AD by way of a loan "for, and in support of Devon AD's assumed obligation to pay IBM under an assignment agreement between Devon IT and Devon AD to carry out the duties of the Hosted Client Agreement summarized in paragraph 4 [the Purpose section]."

45.     Claret Nominees further agreed under Section 3 of the Devon AD Shareholders Agreement to make an equity investment to Devon AD to an aggregate total of Two Million Dollars ($2,000,000.00).

46.     Claret Nominees made three $500,000.00 installment payments to provide working capital to Devon AD.  These payments were made on or about September 21, 2007, December 22, 2007, and March 1, 2008.

47.     Lastly, Claret Nominees agreed under Section 3 of the Devon AD Shareholders Agreement that the first Five Hundred Thousand Dollars ($500,000.00) of the $11,000,000.00 loan would be paid directly to Devon IT and/or Bennett to reimburse them for funds previously paid to IBM by Devon IT and/or Bennett under the Original Hosted Client Agreement.

48.     The remaining payments made toward the $11,000,000.00 loan referenced in Section 3 of the Devon AD Shareholders Agreement related to payments due to IBM under the Original Hosted Client Agreement on or about September 21, 2007, December 22, 2007, and March 1, 2008, and total $8,000,000.00.

49.     To date, Claret Nominees has advanced Eight Million Dollars ($8,000,000.00) of the loan through its affiliate Shiraz Ltd., and One Million, Five Hundred Thousand Dollars ($1,500,000.00) of the equity investment, and Five Thousand Dollars ($5,000.00) as payment for shares, bringing the total amount that Claret Nominees and its affiliates have advanced to Devon AD to Nine Million, Five Hundred and Five Thousand Dollars ($9,505,000.00).

50.     Under Section 6 of the Devon AD Shareholders Agreement, Bennett cannot "enter into any material or onerous agreement or arrangement relating to the business engaged in by Devon AD" without the prior written consent of Claret Nominees.

51.     Under Section 7 of the Devon AD Shareholders Agreement, without the approval of the Board, Devon AD shall not "amend or alter the terms of any material contract or

commitment" or "approve any business development plan for Devon AD . . . or amend or deviate in any material respect from any agreed business plan."

52.     In late 2007, IBM and Devon AD entered into a Marketing Agreement (the "Marketing Agreement"), in which the parties established a joint marketing plan for sales of the Hosted Client Solution.

53.     Under the Marketing Agreement, Devon AD received the right to sell IBM products directly to the market, and both IBM and Devon AD were to receive a revenue margin.

54.     Although representatives of Claret Nominees have requested copies of the Marketing Agreement, this request has been refused or ignored by Bennett and Makoid.

55.     On October 22, 2007, Bennett and Makoid on behalf of Devon AD issued a loan note (the "Devon AD Note") in the amount of $2.5 million reflecting that Shiraz Ltd., Claret Nominees' affiliate, is the registered holder of the Devon AD Note.

56.     In or about November 2007, Claret Blade attempted to secure a Resolution from the Devon Europe Board of Directors that would confirm the parties' agreement that the Devon Europe Notes would be accelerated and repaid as soon as money began to flow into the Company.

57.     While Bennett agreed to the proposed Board Resolution in principle, no formal Board Resolution was ever executed.

## III.   IBM Seeks to Renegotiate the Original Hosted Client and Original Blade Agreements

58.     In or about late March or early April 2008, IBM approached Makoid in Somers, New York and informed Makoid that they wanted to explore the possibility of restructuring the two agreements.

59.     Several days later, on April 3, 2008, Bernie Meyerson of IBM, Bennett, and Claret representatives Domhnal Slattery, Tom McAleese, and Paul Geaney met in New York to discuss an unrelated venture, but no mention was made of IBM's intention to seek restructuring of the agreements.

## IV.     Bennett's Refusal to Include the Claret Entities in Negotiations

60.     Although Bennett and Makoid had known since March or April 2008, that IBM was seeking termination or restructuring of its agreements with Devon AD and Devon Europe, Bennett and Makoid did not inform the Claret entities of this development until a combined meeting of the Board of Directors of Devon AD and Devon Europe on or about May 8, 2008.

61.     Bennett and Makoid informed Claret representatives that they were engaged in negotiations with IBM regarding possible new agreements some time later in May 2008.

62.     At the May 8, 2008 Board meeting and several times thereafter, the Claret entities then sought to become involved in the negotiating team, specifically through their representative James Kane.

63.     Bennett told Kane that the Claret entities could not participate in these negotiations.

64.     Repeatedly and regularly throughout May and June 2008, Bennett and Makoid made assurances to Claret representatives Slattery, Kane, Paul Kealy, and Max Doyle, that they would be looking out for the Claret entities' interests and would handle the negotiations on the Claret entities' behalf.

#9888908 v.8

65.     The Claret entities continued their attempts to become involved in the negotiations, and while Makoid agreed that the Claret entities should become involved, Bennett continued to refuse to allow the Claret entities to do so.

66.     During numerous discussions in May and June 2008, Bennett represented to Kane that despite his efforts to secure a cash payment, IBM would not make any cash payment as a result of any restructuring of the Original Blade Agreement due to internal IBM accounting requirements.

67.     Repeatedly and regularly throughout May and June 2008, Bennett represented to Claret representatives that because the negotiations arose out of IBM's desire to restructure, the interests of the Claret entities and the Devon entities were aligned in seeking to obtain the best possible deal from IBM.

68.     Despite Bennett and Makoid's assurances that the Claret entities' interest would be represented, from May through June 2008, Kane repeatedly made requests for documentation evidencing the status of Bennett's negotiations with IBM, all of which Bennett and Makoid refused.

69.     In mid-June 2008, Kane was finally able to obtain a copy of a spreadsheet that tracked the offers and positions of each party (i.e., IBM and Devon IT) during the negotiations.

70.     Despite repeated requests, Kane was never able to obtain an updated copy of this spreadsheet.

71.     In mid to late June 2008, Kane contacted a representative of IBM to discuss the negotiations directly, and Kane was informed that Bennett had forbidden IBM from speaking with any Claret representatives.

-13-

72.     After the May 8, 2008 meeting Bennett held no formal Board of Directors meetings or shareholders meetings to disclose the details of these negotiations, their progress, or the entities' goals and plans with respect to the IBM contracts.

73.     Bennett held no vote of the Board of Directors or shareholders on whether to pursue new arrangements with IBM or whether new agreements should be executed on behalf of Devon AD and Devon Europe.

74.     On or about July 7, 2008 at a meeting between Bennett, Kane, and Doyle, the Claret entities learned that new agreements with IBM, a "restructured" Original Blade Agreement and "restructured" Original Hosted Client Agreement, were "all but complete."

75.     Kane and Doyle informed Bennett that the Claret entities would need to review copies of both agreements, that the Claret entities wanted their representative Paul Kealy to audit the financial terms of the agreements, and that the Claret entities would need authorization to speak with IBM regarding these agreements.

76.     At the July 7, 2008 meeting, Bennett showed Kane and Doyle an unsigned copy of an agreement that amended the Original Hosted Client Agreement, at which point Kane and Doyle pointed out to Bennett that the wiring instructions were arranged so that Devon IT would receive the payments under this agreement.

77.     Bennett informed Kane and Doyle that the provision calling for payment to Devon IT was an "oversight."

78.     Bennett did not show Kane and Doyle a copy of the restructured Blade Agreement on July 7, 2008, because Bennett represented that the terms of this agreement had already been disclosed to the Claret entities.

#9888908 v8

79.    Not until July 22, 2008 did Bennett allow Kane to review both new agreements.  By that time, both were executed, without Claret having any input, and in a manner that materially harms Claret, all as alleged in detail below.

**V.    Bennett's Diversion of Funds to Exclusively Bennett-Owned Entities**

    **A.    The 2008 Blade Agreement**

80.    Upon Kane's review on July 22, 2008, Claret Blade learned that on July 10, 2008 Devon IT and IBM entered into a new agreement entitled the "Blade Enablement Agreement" ("2008 Blade Agreement").  Bennett had signed the agreement on behalf of Devon IT.

81.    The 2008 Blade Agreement purports to "restructure" the Original Blade Agreement between Devon IT and IBM, but in doing so wholly ignores the December 2006 Deed of Assignment, which assigned Devon IT's rights under the Original Blade Agreement to Devon Europe.

82.    The 2008 Blade Agreement requires IBM to pay Devon IT the sum of Four Million Seven Hundred and Sixty Thousand and xx/100 Dollars ($4,760,000.00).  Upon information and belief, those funds were wired to Devon IT's account on or about July 28, 2008, as provided by the 2008 Blade Agreement.

83.    The Claret entities had never been informed that any cash payment had been contemplated under the 2008 Blade Agreement, and in fact had repeatedly been told the opposite by Bennett.

84.    Devon Europe has not assigned any of its rights under the Original Blade Agreement to Devon IT.  To the contrary, the Deed of Assignment dated December 18, 2006 remains in effect and has not been rescinded, amended, or otherwise altered.

-15-

85.     By negotiating the terms of the 2008 Blade Agreement to direct payment to Devon IT instead of Devon Europe, Bennett and Makoid engaged in self-dealing and diverted funds from Devon Europe, a company in which Claret Blade has a 10% interest, back to a company (Devon IT) in which Bennett and Makoid have sole ownership and Bennett has control.

86.     Further, Bennett and Makoid structured the 2008 Blade Agreement between Devon IT and IBM to preclude Devon Europe from utilizing revenues under the 2008 Blade Agreement in order to repay the Devon Europe Notes.

87.     Since the material business that Devon Europe performs is pursuant to the Blade Agreement, structuring the 2008 Blade Agreement to the exclusion of Devon Europe and ensuring that Devon Europe will not benefit from the revenues that the 2008 Blade Agreement generates places Devon Europe in a position where it is effectively unable to generate revenues, the effect of which will be to leave Devon Europe insolvent.

**B.      The 2008 Hosted Client Agreement**

88.     Bennett's and Makoid's intentional and inappropriate diversion of a corporate opportunity to an entity of which they owned the majority of shares (and Claret entities none) did not end with the diversion of the Original Blade Agreement.

89.     On July 22, 2008, Kane also discovered that on July 10, 2008, Bennett executed a new agreement between Devon IT, Devon AD and IBM titled the Hosted Client Solution Enablement Agreement (the "2008 Hosted Client Agreement").  Bennett signed this agreement on behalf of Devon IT and Devon AD.

90.     Unlike the Original Hosted Client Agreement, where IBM and Devon AD were responsible for manufacturing their respective products and receiving revenues from these products, under the 2008 Hosted Client Agreement, though Devon AD has the right to manufacture IBM and Devon AD products, it has no revenue stream with which to fund this

-16-

production since Devon IT receives the royalty payments under the 2008 Hosted Client Agreement.

91.     Bennett therefore structured this agreement to preclude Devon AD from utilizing revenues generated by the 2008 Hosted Client Agreement to repay funds advanced by Claret Nominees and its affiliates, since Devon AD effectively has no ability to generate revenue under the 2008 Hosted Client Agreement.

92.     Further, Devon AD does not have the capacity for manufacture, and this arrangement will require Devon AD to subcontract this work to Devon IT, ensuring that Devon IT will gain additional funds as a result of the restructuring, leaving Devon AD with no ability to repay Claret Nominees.

## COUNT ONE

### FRAUD

### (Claret Blade v. Bennett, Makoid, and Devon IT)

93.     Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

94.     On May 8, 2008, Bennett informed Claret representatives Kane, Slattery, Kealy, and Doyle that IBM was seeking termination or restructuring of its agreements with Devon AD and Devon Europe.

95.     Later in May 2008, Bennett informed Claret representatives that was engaged in negotiations with IBM regarding possible new agreements.

96.     During several further discussions during May 2008, Bennett and Makoid assured Kane, Slattery, Kealy, and Doyle that they would be protecting the Claret entities' interests and would handle the negotiations on Claret Blade's behalf.

299889908.v8

97.     During these discussions, Bennett represented to Kane, Slattery, Kealy, and Doyle that IBM would not make any cash payment as a result of any restructuring of the Blade Agreement.

98.     On or about July 7, 2008 at a meeting between Bennett, Kane, and Doyle, the Claret entities learned that new agreements with IBM, a "restructured" Original Blade Agreement and "restructured" Original Hosted Client Agreement, were all but complete.

99.     At the July 7, 2008 meeting, Bennett showed Kane and Doyle an unsigned copy of an agreement that amended the Original Hosted Client Agreement, at which point Kane and Doyle pointed out to Bennett that the wiring instructions were arranged so that Devon IT would receive the payments under this agreement.

100.    Bennett informed Kane and Doyle that the provision calling for payment to Devon IT was an "oversight."

101.    Bennett did not show Kane and Doyle a copy of the restructured Blade Agreement on July 7, 2008, because Bennett represented that the terms of this agreement had already been disclosed to the Claret entities.

102.    On Tuesday, July 22, 2008, Bennett allowed Kane to review the 2008 Blade Agreement and the 2008 Hosted Client Agreement.

103.    Upon Kane's review on July 22, 2008, Claret Blade learned that on July 10, 2008 Devon IT and IBM entered into a new agreement entitled the "Blade Enablement Agreement" ("2008 Blade Agreement").  Bennett had signed the agreement on behalf of Devon IT.

104.    The 2008 Blade Agreement purports to "restructure" the Original Blade Agreement between Devon IT and IBM, but in doing so wholly ignores the December 2006

Deed of Assignment, which assigned Devon IT's rights under the Original Blade Agreement to Devon Europe.

105.    The 2008 Blade Agreement requires IBM to pay Devon IT the sum of Four Million Seven Hundred and Sixty Thousand and xx/100 Dollars ($4,760,000.00).  Upon information and belief, those funds were wired to Devon IT's account on or about July 28, 2008, as provided by the 2008 Blade Agreement.

106.    The Claret entities had never been informed that any cash payment had been contemplated under the 2008 Blade Agreement, and in fact had repeatedly been told the opposite by Bennett.

107.    Bennett and Makoid's representations throughout May 2008 and on July 7, 2008 (a) that Claret Blade's interests would be protected, (b) that IBM would not be making a cash payment under the new agreement, and (c) that the terms of the 2008 Blade Agreement had already been disclosed to the Claret entities, constituted false representations of material facts.

108.    Bennett and Makoid's failure to disclose (a) the fact that Devon IT would receive $4.76 million plus royalty payments under the 2008 Blade Agreement, and (b) that Devon Europe would not be a party to this agreement constituted material omissions of facts.

109.    Given that Bennett represented on July 7, 2008 that the agreements were "all but complete," and given the actual terms of the 2008 Blade Agreement, at the time Bennett and Makoid made the representations throughout May 2008 and on July 7, 2008, both Bennett and Makoid knew or should have reasonably known the representations were false.

110.    Bennett and Makoid made these false statements and omitted certain other facts with the intent that the Claret Blade would rely upon the false statements and omissions and allow Bennett and Makoid to purportedly negotiate the new agreement with IBM on its behalf.

-19-

111.   Bennett and Makoid made these false statements and omitted certain other facts with the intent that the Claret Blade would rely upon the false statements and omissions and not seek to prevent the execution of the 2008 Blade Agreement.

112.   It was reasonable for Claret Blade to rely upon these representations because the negotiations arose out of IBM's desire to restructure its agreements, and it therefore appeared that the interests of the Claret entities and the Devon entities were aligned in seeking to obtain the best possible deal from IBM.

113.   In reliance on Bennett and Makoid's representations, Claret Blade did not attempt to renegotiate the Original Blade Agreement with IBM directly, to its detriment.

114.   As a result of Bennett and Makoid's false statements and omissions of fact, Claret Blade has suffered damages in the form of the lost opportunity under the 2008 Blade Agreement and is in danger of suffering further damages in the form of its loan to Devon Europe not being repaid.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

a.   entry of judgment against the Defendants awarding Claret Blade compensatory damages in an amount to be determined at trial;

b.   entry of judgment against the Defendants awarding Claret Blade punitive damages in an amount to be determined at trial;

c.   entry of judgment against the Defendants awarding Claret Blade reasonable attorney's fees, costs and interest; and

d.   entry of judgment against the Defendants awarding Claret Blade such other and further relief as this Court deems just and proper.

#9888908 v8

## COUNT TWO

## FRAUDULENT TRANSFER UNDER 12 PA. C. S. §§ 5101-5110

### (Claret Blade v. Bennett, Devon Europe, and Devon IT)

115.     Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

116.     The 2008 Blade Agreement requires IBM to pay Devon IT the sum of Four Million Seven Hundred and Sixty Thousand and xx/100 Dollars ($4,760,000.00).  Upon information and belief, those funds were wired to Devon IT's account on or about July 28, 2008, as anticipated by the 2008 Blade Agreement.

117.     Devon Europe has not assigned any of its rights under the Original Blade Agreement to Devon IT.  To the contrary, the Deed of Assignment dated December 18, 2006 remains in effect and has not been rescinded, amended, or otherwise altered.

118.     Accordingly, pursuant to the Deed of Assignment, all rights, duties, and obligations under the Original Blade Agreement belonged to Devon Europe at the time the 2008 Blade Agreement was executed.

119.     Bennett's restructuring of the 2008 Blade Agreement constituted a transfer of the rights Devon Europe held pursuant to the Original Blade Agreement and Deed of Assignment to Devon IT.

120.     Devon Europe received no value in exchange for Bennett transferring Devon Europe's rights to Devon IT.

121.     At the time of this transfer, Devon Europe was indebted to Claret Blade in the amount of Three Million, Six Hundred Eighty Six Thousand, Seven Hundred Forty-Eight and xx/100 Dollars ($3,686,748.00) pursuant to the Devon Europe Notes.

122.   Further, Bennett and Makoid structured the 2008 Blade Agreement between Devon IT and IBM to preclude Devon Europe from utilizing revenues under the 2008 Blade Agreement in order to repay the Devon Europe Notes.

123.   Since the material business that Devon Europe performs is pursuant to the Blade Agreement, structuring the 2008 Blade Agreement to the exclusion of Devon Europe will deprive Devon Europe of substantially all of its assets.

124.   The 2008 Blade Agreement, and the transfer of rights thereunder, was concealed from Devon Europe's creditors, including Claret Blade.

125.   By transferring Devon Europe's rights under the Original Blade Agreement and the Deed of Assignment to Devon IT, Bennett intended that Devon Europe would incur, or believed or reasonably should have believed that Devon Europe would incur, debts beyond Devon Europe's ability to pay as they became due.

126.   Bennett transferred Devon Europe's rights under the Original Blade Agreement and the Deed of Assignment to Devon IT with actual intent to hinder, delay or defraud Claret Blade.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

a.   entry of an injunction against Devon IT enjoining Devon IT from moving, disbursing, spending, wasting, expending, transferring, in whole or in part, the $4.76 million payment wired to Devon IT by IBM under the 2008 Blade Agreement;

b.   entry of an injunction against further disposition by Devon IT of the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

49888908 \8

       c.     entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Blade Agreement are the property of Devon Europe;

       d.     entry of judgment against Devon IT awarding Claret Blade a constructive trust over the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

       e.     entry of judgment against Devon IT avoiding the transfer under the 2008 Blade Agreement to the extent necessary to satisfy Claret's claim under the Devon Europe Notes; and

       f.     entry of judgment against Devon IT awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT THREE

### UNJUST ENRICHMENT

### (Claret Blade v. Devon IT)

127.    Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

128.    To date, Claret has advanced Three Million, Six Hundred Eighty Six Thousand, Seven Hundred Forty-Eight and xx/100 Dollars ($3,686,748.00) in order to fund the venture between Devon Europe and IBM under the Blade Agreements.

129.    Devon IT benefitted from this funding because it allowed Devon IT to negotiate and execute the 2008 Blade Agreement based on Devon Europe's existing relationship with IBM.

130.    By restructuring the relationship between the Devon entities and IBM so that only Devon IT would receive royalties from the 2008 Blade Agreement, Devon IT retained the benefit of Claret Blade's funding.

131.    Since Claret Blade was given no opportunity to participate in the negotiation of the 2008 Blade Agreement in order to protect its interests and its investment in Devon Europe, it would be inequitable for Devon IT to retain the benefit of Claret Blade's funding without payment of value for that funding.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

a.      entry of an injunction against Devon IT enjoining Devon IT from moving, disbursing, spending, wasting, expending, transferring, in whole or in part, the $4.76 million payment wired to Devon IT by IBM under the 2008 Blade Agreement;

b.      entry of an injunction against further disposition by Devon IT of the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

c.      entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Blade Agreement are the property of Devon Europe;

d.      entry of judgment against Devon IT awarding Claret Blade a constructive trust over the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

e.      entry of judgment against Devon IT awarding Claret Blade restitutionary damages in an amount to be determined at trial;

f.      entry of judgment against Devon IT awarding Claret Blade punitive damages in an amount to be determined at trial;

g.      entry of judgment against Devon IT awarding Claret Blade reasonable attorney's fees, costs and interest; and

h.     entry of judgment against Devon IT awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT FOUR

### BREACH OF DUTY OF LOYALTY/ DIVERSION OF CORPORATE OPPORTUNITY

**(Claret Blade on behalf of Devon Europe v. Bennett, Makoid, and Devon IT)**

132.     Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

133.     Claret Blade brings the cause of action outlined in this Count Four of the Complaint derivatively in the right and for the benefit of Devon Europe in order to redress injuries suffered, and to be suffered, by Devon Europe as a direct result of breaches of the duty of loyalty by individual defendants Bennett and Makoid and by co-defendant Devon IT.

134.     Claret Blade will adequately and fairly represent the interests of Devon Europe in enforcing and prosecuting its rights because, among other things, it has a substantial interest in prosecuting the claims and has the resources to prosecute the claims.

135.     Claret Blade is an owner of the stock of Devon Europe during all times relevant to the breaches of the duty of loyalty alleged herein, and remains a shareholder of Devon Europe.

136.     At all relevant times, Bennett and Makoid served as the members of the Devon Europe Board of Directors.

137.     The remaining two directors, Doyle and Slattery, are representatives of Claret Blade.

138.     Devon IT is the majority shareholder of Devon Europe.

59888908 v8

139.    Defendants Bennett and Makoid participated in, knew of and/or directly benefited from the wrongdoing complained of herein.  As such, Bennett and Makoid are not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

140.    A demand to the Devon Europe Board would be a futile, wasteful, and a useless act for the following reasons:

a.    Half of the directors on the Devon Europe Board are defendants herein, and as such, are incapable, based upon their acts as described herein, of independently and disinterestedly considering a demand to commence and vigorously prosecute this action or seek other redress;

b.    The other half of the Devon Europe Board are Claret Blade representatives, which would result in a deadlock if the Board were presented with a demand;

c.    Bennett's and Makoid's fraudulent scheme to divert corporate opportunities for their own benefit was unlawful and not within the Devon Europe Board's business judgment to authorize ratify or facilitate.

141.    Bennett and Makoid were aware at all relevant times, or should have been aware, that directors and majority shareholders owe a duty of loyalty to the corporation which prohibits them from usurping a corporate opportunity that belongs to the corporation.

142.    When Bennett, Makoid, and Devon IT were presented with the 2008 Blade Agreement, Devon Europe was capable and financially able to fulfill the obligations under the 2008 Blade Agreement.

143.    Since the 2008 Blade Agreement restructured the original Blade Agreement, this opportunity was within Devon Europe's exclusive line of business.

144. Given that the 2008 Blade Agreement provides for payment to Devon IT in the amount of $4,760,000.00, this opportunity would have been of practical advantage to Devon Europe in satisfying its obligations under the Devon Europe Notes.

145. This profit was not disclosed to Devon Europe.

146. Because Devon Europe was the original recipient of the royalty payments under the original Blade Agreement, and the original Blade Agreement was not scheduled to be terminated, Devon Europe had a reasonable expectancy of an interest in the 2008 Blade Agreement.

147. By embracing the opportunity of the 2008 Blade Agreement, Bennett, Makoid, and Devon IT placed their own self-interests above that of Devon Europe.

148. As a result, Bennett's, Makoid's and Devon IT's self-interests will be brought into conflict with that of Devon Europe and the interests of Devon Europe's shareholders.

149. As a result, Devon Europe and its minority shareholder Claret Blade have suffered damages.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

    a.    entry of judgment against the Defendants awarding Devon Europe and Claret Blade compensatory damages in an amount to be determined at trial;

    b.    entry of judgment against the Defendants awarding Devon Europe and Claret Blade disgorgement of profits wrongfully obtained by the Defendants;

    c.    entry of judgment against the Defendants awarding Devon Europe and Claret Blade punitive damages in an amount to be determined at trial;

#9888908 v8

d.      entry of judgment against the Defendants awarding Devon Europe and Claret Blade reasonable attorney's fees, costs and interest; and

e.      entry of judgment against the Defendants awarding Devon Europe and Claret Blade such other and further relief as this Court deems just and proper.

## COUNT FIVE

### BREACH OF FIDUCIARY DUTIES BY DIRECTORS

### (Claret Blade v. Bennett and Makoid)

150.     Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

151.     As directors of Devon Europe, Bennett and Makoid owe a fiduciary duty of loyalty that carried with it the duty of utmost loyalty, duty of care, and duty of disclosure to Devon Europe and all of Devon Europe's shareholders, including Claret Blade.

152.     In or about April 2008, Claret Blade attempted to secure a resolution from the Devon Europe Board of Directors that would confirm the parties' agreement that the Devon Europe Notes would be accelerated and repaid as soon as money began to flow into the Company.

153.     Although Claret Blade requested that the Devon Europe Board adopt a Resolution regarding repayment of the Devon Europe Notes, and Bennett agreed in principle to the proposed Resolution, no Board Resolution was ever executed.

154.     Bennett and Makoid negotiated and executed the 2008 Blade Agreement without giving Claret Blade an opportunity to review or consider the 2008 Blade Agreement and without the consent, direction, authorization or approval of Claret Blade.

155.     After the May 8, 2008 Board of Directors meeting where it was announced that IBM was seeking to restructure the Blade Agreement, Bennett and Makoid held

no formal Board of Directors meetings or shareholders meetings to discuss the status of these negotiations.

156.    From May through June 2008, Kane repeatedly made requests to Bennett and Makoid for documentation evidencing the status of Bennett's negotiations with IBM, all of which were refused.

157.    Throughout May and June 2008, Kane requested to be included in the renegotiation of the Blade Agreement on behalf of Claret Blade, and was prohibited from doing so by Bennett and Makoid.

158.    Claret Blade was excluded both formally and informally from discussions with IBM regarding the new agreements.

159.    Bennett and Makoid held no vote of the Board of Directors or shareholders on whether to pursue the 2008 Blade Agreement or whether the 2008 Blade Agreement should have been executed on Devon Europe's behalf.

160.    Bennett and Makoid adopted no Board Resolutions that were shared with Claret Blade that described these material decisions affecting Claret Blade and Devon Europe.

161.    Because Devon IT is the only entity that benefits from the 2008 Blade Agreement, Bennett and Makoid, as the sole shareholders of Devon IT, put their own self-interests above those of the corporation and the minority shareholders.

162.    The 2008 Blade Agreement is structured against Claret Blade and Devon Europe's interests because its ensures not only that Claret Blade will receive no benefits as a minority stockholder in Devon Europe but also that Devon Europe will receive no revenue under the 2008 Blade Agreement with which to repay the loans made by Claret Blade.

-29-

163.    By failing to disclose the terms by which the Original Blade Agreement was terminated or the material terms of the 2008 Blade Agreement, Bennett and Makoid breached their fiduciary duties to Claret Blade.

164.    The 2008 Blade Agreement is a material and onerous agreement.

165.    By entering into the 2008 Blade Agreement without holding shareholder meetings, obtaining shareholder approval, or otherwise consulting with the shareholders of Devon Europe, Bennett and Makoid breached their fiduciary duties to Claret Blade.

166.    By entering into the 2008 Blade Agreement, which harmed the interests of Claret Blade and Devon Europe, Bennett and Makoid breached their fiduciary duties to Claret Blade.

167.    By entering into the 2008 Blade Agreement, which benefited only one member of Devon Europe (Devon IT), Bennett and Makoid breached their fiduciary duties to Claret Blade.

168.    As a result of Bennett's and Makoid's breaches of their fiduciary duties, Devon Europe will be potentially rendered insolvent.

169.    As a result of Bennett's and Makoid's breaches of their fiduciary duties, Claret Blade has been damaged.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

a.      entry of an injunction against Devon IT enjoining Devon IT from moving, disbursing, spending, wasting, expending, transferring, in whole or in part, the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

b.        entry of an injunction against further disposition by Devon IT of the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

c.        entry of judgment against Devon IT awarding Claret Blade a constructive trust over the $4,760,000.00 payment wired to Devon IT by IBM under the 2008 Blade Agreement;

d.        entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Blade Agreement are the property of Devon Europe;

e.        entry of judgment against Bennett and Makoid awarding Claret Blade compensatory damages in an amount to be determined at trial;

f.        entry of judgment against Bennett and Makoid awarding Claret Blade punitive damages in an amount to be determined at trial;

g.        entry of judgment against Bennett and Makoid awarding Claret Blade reasonable attorney's fees, costs and interest; and

h.        entry of judgment against Bennett and Makoid awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT SIX

### MINORITY SHAREHOLDER OPPRESSION

### (Claret Blade v. Devon IT, Bennett and Makoid)

170.    Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

171.    Claret Blade is a minority shareholder in and creditor of Devon Europe.

172.    Devon IT is the majority shareholder of Devon Europe.

173.    Bennett and Makoid are directors of Devon Europe.

#9888908 v8

174.    When Claret Blade committed its capital and made loans to Devon Europe, it was with the reasonable expectation that the investment would be profitable and the loans would be repaid because of the existence of the Original Blade Agreement.

175.    If Claret Blade had known that Bennett, Makoid, and Devon IT intended to unilaterally terminate the Original Blade Agreement before Claret Blade received a return on its investment or repayment of the loans, Claret Blade would not have committed its capital to Devon Europe at the outset.

176.    The 2008 Blade Agreement violates Claret Blade's reasonable expectations as a minority shareholder because it terminates benefits that belonged to Devon Europe and grants these benefits to Devon IT.

177.    By structuring the 2008 Blade Agreement so that only Devon IT receives a benefit, Devon IT abused its discretion as controlling shareholder.

178.    Bennett, Makoid, and Devon IT's conduct with respect to the 2008 Blade Agreement is a visible departure from the standards of fair dealing and fair play.

179.    Bennett, Makoid, and Devon IT's conduct with respect to the 2008 Blade Agreement is evidence that Bennett and Makoid's powers as directors of Devon Europe are being exercised in a manner oppressive to Claret Blade.

180.    As a result of Devon IT's conduct with respect to the Blade Agreement, Claret Blade has suffered damages.

181.    The foregoing allegations constitute a violation of common law and statutory law including Section 205 of the Irish Companies Act 1963 and 15 Pa.C.S. § 1767.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

49888908 \8

a.      entry of judgment against Devon IT awarding Claret Blade compensatory damages in an amount to be determined at trial;

b.      entry of judgment against Devon IT awarding Claret Blade punitive damages in an amount to be determined at trial;

c.      entry of judgment against Devon IT awarding Claret Blade reasonable attorney's fees, costs and interest; and

d.      entry of judgment against Devon IT awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT SEVEN

## VIOLATION OF SECTION 29 OF THE COMPANIES ACT 1990

### (Claret Blade v. Bennett and Makoid)

182.    Claret Blade repeats and realleges the foregoing allegations as if set forth at length herein.

183.    Section 29 of the Companies Act 1990 (Ireland) requires shareholder approval for certain arrangements pursuant to which a director of a company (or a company or other person connected with a director) is proposing to acquire non-cash assets from the company.

184.    Acquisition of a non-cash asset includes a reference to the extinction of an estate or interest in, or a right over, any property.

185.    An arrangement entered into by a company in contravention and any transaction entered into pursuant to the arrangement (whether by the company or any other person) is voidable at the instance of the company, other than in specified exceptional circumstances.

186.    Section 29(4) of the Companies Act provides that where the arrangement is entered into with a director or a person connected with him in contravention of the section, that director and the connected person shall (whether or not the transaction has been avoided by the company) be liable to account to the company for any direct or indirect gain and also to indemnify the company for any resulting loss or damage.

187.    Bennett and Makoid, individually or through Devon IT, restructured the Original Blade Agreement and entered into the 2008 Blade Agreement which constitutes an acquisition of a non-cash asset from, and/or or extinguishment of a property right of, Devon Europe.

188.    Bennett and Makoid, individually or through Devon IT, acquired or extinguished the asset of Devon Europe without obtaining shareholder approval.

189.    Bennett's and Makoid's failure to obtain shareholder approval in connection with this transaction constitutes a violation of the Section 29 of the Companies Act 1990.

190.    As a result of Bennett's and Makoid's violation of Section 29 of the Companies Act 1990, Claret Blade has been damaged.

WHEREFORE, Claret Blade respectfully requests that the Court grant it the following relief:

a.    entry of judgment against Bennett and Makoid awarding Claret Blade compensatory damages in an amount to be determined at trial;

b.    entry of judgment against Bennett and Makoid awarding Claret Blade reasonable attorney's fees, costs and interest; and

#9888908 v8

c.    entry of judgment against Bennett and Makoid awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT EIGHT

### FRAUD

### (Claret Nominees v. Bennett and Makoid)

191.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

192.    On May 8, 2008, Bennett informed Claret representatives Kane, Slattery, Kealy, and Doyle that IBM was seeking termination or restructuring of its agreements with Devon AD and Devon Europe.

193.    Later in May 2008, Bennett informed Claret representatives that was engaged in negotiations with IBM regarding possible new agreements.

194.    During several further discussions during May 2008, Bennett and Makoid assured Kane, Slattery, Kealy, and Doyle that they would be protecting the Claret entities' interests and would handle the negotiations on Claret Nominees' behalf.

195.    On or about July 7, 2008 at a meeting between Bennett, Kane, and Doyle, the Claret entities learned that new agreements with IBM, a "restructured" Original Blade Agreement and "restructured" Original Hosted Client Agreement, were "all but complete."

196.    At the July 7, 2008 meeting, Bennett showed Kane and Doyle an unsigned copy of an agreement that amended the Original Hosted Client Agreement, at which point Kane and Doyle pointed out to Bennett that the wiring instructions were arranged so that Devon IT would receive the payments under this agreement.

197.    Bennett informed Kane and Doyle that the provision calling for payment to Devon IT was an "oversight."

-35-

198.   On Tuesday, July 22, 2008, Bennett allowed Kane to review the 2008 Blade Agreement and the 2008 Hosted Client Agreement.

199.   Upon Kane's review on July 22, 2008, Claret Blade learned that on July 10, 2008 Devon IT, Devon AD and IBM entered the 2008 Hosted Client Agreement.  Bennett had signed the agreement on behalf of Devon IT and Devon AD.

200.   Unlike the Original Hosted Client Agreement, where IBM and Devon AD were responsible for manufacturing their respective products and receiving revenues from these products, under the 2008 Hosted Client Agreement, Devon IT receives royalty payments each time the products are sold.

201.   Bennett and Makoid's representations throughout May 2008 and on July 7, 2008 (a) that Claret Blade's interests would be protected and (b) that the provision calling for payments to Devon IT in the 2008 Hosted Client Agreement was an "oversight," constituted false representations of material facts.

202.   Bennett and Makoid's failure to disclose (a) the fact that Devon IT would receive royalty payments under the 2008 Hosted Client Agreement, and (b) that Devon AD would not receive revenues under this agreement constituted material omissions of facts.

203.   Given that Bennett represented on July 7, 2008 that the agreements were "all but complete," and given the actual terms of the 2008 Hosted Client Agreement, at the time Bennett and Makoid made the representations throughout May 2008 and on July 7, 2008, both Bennett and Makoid knew or should have reasonably known the representations were false.

204.   Bennett and Makoid made these false statements and omitted certain other facts with the intent that the Claret Nominees would rely upon the false statements and omissions

and allow Bennett and Makoid to purportedly negotiate the new agreement with IBM on its behalf.

205.    Bennett and Makoid made these false statements and omitted certain other facts with the intent that the Claret Nominees would rely upon the false statements and omissions and not seek to prevent the execution of the 2008 Hosted Client Agreement.

206.    It was reasonable for Claret Nominees to rely upon these representations because the negotiations arose out of IBM's desire to restructure its agreements, and it therefore appeared that the interests of the Claret entities and the Devon entities were aligned in seeking to obtain the best possible deal from IBM.

207.    In reliance on Bennett and Makoid's representations, Claret Nominees did not attempt to renegotiate the Original Hosted Client Agreement with IBM directly, to its detriment.

208.    As a result of Bennett and Makoid's false statements and omissions of fact, Claret Nominees has suffered damages in the form of the lost opportunity under the 2008 Hosted Client Agreement and is in danger of suffering further damages in the form of Claret Nominees' and its affiliates' loans to Devon AD not being repaid.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

a.    entry of judgment against Bennett and Makoid awarding Claret Nominees compensatory damages in an amount to be determined at trial;

b.    entry of judgment against Bennett and Makoid awarding Claret Nominees punitive damages in an amount to be determined at trial;

#0888908 v8

      c.     entry of judgment against Bennett and Makoid awarding Claret Nominees reasonable attorney's fees, costs and interest; and

      d.     entry of judgment against Bennett and Makoid awarding Claret Nominees such other and further relief as this Court deems just and proper.

### COUNT NINE

### FRAUDULENT TRANSFER UNDER 12 PA. C. S. §§ 5101-5110

### (Claret Nominees v. Bennett, Devon AD, and Devon IT)

209.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

210.    The 2008 Hosted Client Agreement diverts to Devon IT all royalties for products sold under that agreement, and eliminates Devon AD's right to receive revenue under paragraph one of the First Amendment to the Hosted Client Agreement and the Marketing Agreement for the sale of these products.

211.    Bennett's restructuring of the 2008 Hosted Client Agreement constituted a transfer of the rights Devon AD held pursuant to the First Amendment to the Hosted Client Agreement and the Marketing Agreement to Devon IT.

212.    Devon AD received no value in exchange for Bennett transferring Devon AD's rights to Devon IT.

213.    At the time of this transfer, Devon AD was indebted to Claret Nominees and its affiliates in the amount of Nine Million, Five Hundred and Five Thousand Dollars ($9,505,000.00).

214.    Further, Bennett and Makoid structured the 2008 Hosted Client Agreement to preclude Devon AD from utilizing revenues under the 2008 Hosted Client Agreement in order to repay its obligations to Claret Nominees and its affiliates.

-38-

215.    Since the material business that Devon AD performs is pursuant to the Hosted Client Agreement, structuring the 2008 Hosted Client Agreement to the exclusion of Devon AD will deprive Devon AD of substantially all of its assets.

216.    The 2008 Hosted Client Agreement, and the transfer of rights thereunder, was concealed from Devon AD's creditors, including Claret Nominees.

217.    By transferring Devon AD's rights under the First Amendment to the Hosted Client Agreement and the Marketing Agreement to Devon IT, Bennett intended that Devon AD would incur, or believed or reasonably should have believed that Devon AD would incur, debts beyond Devon AD's ability to pay as they became due.

218.    Bennett transferred Devon AD's rights to receive commissions under the First Amendment to the Hosted Client Agreement and the Marketing Agreement to Devon IT with actual intent to hinder, delay or defraud Claret Nominees.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

a.    entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Hosted Client Agreement are the property of Devon AD;

b.    entry of judgment against the defendants awarding Claret Blade a constructive trust over any payments made by IBM under the 2008 Hosted Client Agreement;

c.    entry of judgment against the defendants avoiding the transfer under the 2008 Hosted Client Agreement to the extent necessary to satisfy Claret Nominees' claim pursuant to its loans to Devon AD; and

d.    entry of judgment against the defendants awarding Claret Blade such other and further relief as this Court deems just and proper.

## COUNT TEN

## UNJUST ENRICHMENT

### (Claret Nominees v. Devon IT)

219.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

220.    To date, Claret Nominees and its affiliates have advanced a total of Nine Million, Five Hundred Five Thousand Dollars ($9,505,000.00) to Devon AD in order to fund the venture between Devon AD and IBM under the Original Hosted Client Agreement.

221.    Devon IT benefitted from this funding because it allowed Devon IT to negotiate and execute the 2008 Hosted Client Agreement based on Devon AD's existing relationship with IBM.

222.    By restructuring the relationship between the Devon entities and IBM so that only Devon IT would profit from the 2008 Hosted Client Agreement, Devon IT retained the benefit of Claret Nominees' funding.

223.    Since Claret Nominees was given no opportunity to participate in the negotiation of the 2008 Hosted Client Agreement in order to protect its interests and its investment in Devon AD, it would be inequitable for Devon IT to retain the benefit of Claret Nominees' funding without payment of value for that funding.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

a.    entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Hosted Client Agreement are the property of Devon AD;

b.    entry of judgment against Devon IT awarding Claret Blade a constructive trust over any payments made by IBM under the 2008 Hosted Client Agreement;

-40-

c. entry of judgment against Devon IT awarding Claret Nominees restitutionary damages in an amount to be determined at trial;

d. entry of judgment against Devon IT awarding Claret Nominees reasonable attorney's fees, costs and interest; and

e. entry of judgment against Devon IT awarding Claret Nominees such other and further relief as this Court deems just and proper.

## COUNT ELEVEN

### BREACH OF DUTY OF LOYALTY/ DIVERSION OF CORPORATE OPPORTUNITY

### (Claret Nominees on behalf of Devon AD v. Bennett and Makoid)

224. Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

225. Claret Nominees brings the cause of action outlined in this Count Eleven of the Complaint derivatively in the right and for the benefit of Devon AD in order to redress injuries suffered, and to be suffered, by Devon AD as a direct result of breaches of the duty of loyalty by individual defendants Bennett and Makoid.

226. Claret Nominees will adequately and fairly represent the interests of Devon AD in enforcing and prosecuting its rights because, among other things, it has a substantial interest in prosecuting the claims and has the resources to prosecute the claims.

227. Claret Nominees is an owner of the stock of Devon AD during all times relevant to the breaches of the duty of loyalty alleged herein, and remains a minority shareholder of Devon AD.

228. At all relevant times, Bennett and Makoid served as the members of the Devon AD Board of Directors.  Slattery is the third director.

-41-

229. Bennett is the majority shareholder of Devon AD.

230. Defendants Bennett and Makoid participated in, knew of and/or directly benefited from the wrongdoing complained of herein. As such, Bennett and Makoid are not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

231. A demand to the Devon AD Board would be a futile, wasteful, and a useless act for the following reasons:

a. Two-thirds of the directors on the Devon AD Board are defendants herein, and as such, are incapable, based upon their acts as described herein, of independently and disinterestedly considering a demand to commence and vigorously prosecute this action or seek other redress;

b. The remaining director on the Devon AD Board is a representative of Claret Nominees, which is insufficient to outvote the defendants Bennett and Makoid if a demand were presented to the Board; and

c. Bennett's and Makoid's fraudulent scheme to divert corporate opportunities for their own benefit was unlawful and not within the Devon AD Board's business judgment to authorize ratify or facilitate.

232. Directors and majority shareholders owe a duty of loyalty to the corporation which prohibits them from usurping a corporate opportunity that belongs to the corporation.

233. When Bennett and Makoid were presented with the 2008 Hosted Client Agreement, Devon AD was financially able to undertake the opportunity.

234.   Since the 2008 Hosted Client Agreement is a restructuring of the Original Hosted Client Agreement and Devon AD remains a party to the 2008 Hosted Client Agreement, this opportunity is within Devon AD's line of business.

235.   Given that Devon IT will receive $100 per product sold each quarter in royalty payments under the 2008 Hosted Client Agreement, this opportunity would have been of practical advantage to Devon AD.

236.   Because Devon AD received revenue under the Marketing Agreement for products sold pursuant to the Original Hosted Client Agreement, and neither the Original Hosted Client Agreement nor the Marketing Agreement were scheduled to be terminated, Devon AD had a reasonable expectancy of an interest in the 2008 Hosted Client Agreement.

237.   By embracing the opportunity of the 2008 Hosted Client Agreement, Bennett and Makoid placed their the self-interest above that of the corporation.

238.   As a result, Bennett's and Makoid's self-interests will be brought into conflict with that of Devon AD.

239.   By entering into the 2008 Hosted Client Agreement and restructuring the Original Hosted Client Agreement so that Devon IT would receive the benefits instead of Devon AD, Bennett and Makoid breached their duty of loyalty to Devon AD.

240.   As a result, Devon AD and its minority shareholder Claret Nominees have suffered damages.

WHEREFORE, Claret Nominees on behalf of Devon AD respectfully requests that the Court grant it the following relief:

a.   entry of judgment against Bennett and Makoid awarding Devon AD and Claret Nominees compensatory damages in an amount to be determined at trial;

#9888908 v8

b.      entry of judgment against Bennett and Makoid awarding Devon AD and Claret Nominees disgorgement of profits in an amount to be determined at trial;

c.      entry of judgment against Bennett and Makoid awarding Devon AD and Claret Nominees punitive damages in an amount to be determined at trial;

d.      entry of judgment against Bennett and Makoid awarding Devon AD and Claret Nominees reasonable attorney's fees, costs and interest; and

e.      entry of judgment against Bennett and Makoid awarding Devon AD and Claret Nominees such other and further relief as this Court deems just and proper.

## COUNT TWELVE

## (BREACH OF FIDUCIARY DUTIES BY DIRECTORS)

### (Claret Nominees v. Bennett and Makoid)

241.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

242.    As directors of Devon AD, Bennett and Makoid owe a fiduciary duty of loyalty which carries with it the duty of care, duty of utmost loyalty, and duty of disclosure to Claret Nominees.

243.    Bennett negotiated and executed the 2008 Hosted Client Agreement without the consent, direction, or approval of Claret Nominees.

244.    After the May 8, 2008 meeting Board of Directors meeting where it was announced that IBM was seeking to restructure the Hosted Client Agreement, Bennett held no formal Board of Directors meetings or shareholders meetings to discuss the status of these negotiations.

#9888908 v8

245.    From May through June 2008, Kane repeatedly made requests to Bennett and Makoid for documentation evidencing the status of Bennett's negotiations with IBM, all of which were refused.

246.    Throughout May and June 2008, Kane requested to be included in the renegotiation of the Blade Agreement on behalf of Claret Nominees, and was prohibited from doing so by Bennett and Makoid.

247.    Claret Nominees was excluded both formally and informally from these discussions.

248.    Bennett and Makoid held no vote to determine whether Devon AD should pursue the negotiations with IBM or whether Devon AD should execute the 2008 Hosted Client Agreement.

249.    Bennett and Makoid adopted no Board Resolutions that were shared with Claret Nominees that described these material decisions affecting Claret Nominees and Devon AD.

250.    Because Devon IT is the only entity that benefits from the 2008 Hosted Client Agreement, Devon IT put its own self-interests above those of the minority shareholders.

251.    The 2008 Hosted Client Agreement was structured against Claret Nominees' interests because it ensures not only that Claret Nominees will receive no benefits from the royalty payments under the 2008 Hosted Client Agreement as a minority stockholder in Devon AD, but also that the loans made to Devon AD by Claret Nominees and its affiliates cannot be repaid out of revenue received from the 2008 Hosted Client Agreement.

252.    By failing to disclose the terms of the termination of the Original Hosted Client Agreement or the material terms of the 2008 Hosted Client Agreement, Bennett and Makoid breached their fiduciary duty to Claret Nominees.

253.    By entering into a material and onerous agreement without holding shareholder meetings, obtaining shareholder approval, or otherwise consulting with the shareholders of Devon AD, Bennett and Makoid breached their fiduciary duty to Claret Nominees.

254.    By entering into the 2008 Hosted Client Agreement, which harmed the interests of Claret Nominees and Devon AD, Bennett and Makoid breached their fiduciary duty to Claret Nominees.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

a.      entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Hosted Client Agreement are the property of Devon AD;

b.      entry of judgment against Bennett and Makoid awarding Claret Nominees a constructive trust over the profits Bennett, Makoid, and/or Devon IT gained as a result of Bennett and Makoid's breach of fiduciary duties;

c.      entry of judgment against Bennett and Makoid awarding Claret Nominees compensatory damages in an amount to be determined at trial;

d.      entry of judgment against Bennett and Makoid awarding Claret Nominees punitive damages in an amount to be determined at trial;

e.      entry of judgment against Bennett and Makoid awarding Claret Nominees reasonable attorney's fees, costs and interest; and

-46-

f.     entry of judgment against Bennett and Makoid awarding Claret Nominees such other and further relief as this Court deems just and proper.

## COUNT THIRTEEN

## (BREACH OF FIDUCIARY DUTIES BY MAJORITY SHAREHOLDER)

### (Claret Nominees v. Bennett)

255.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

256.    As the majority shareholder of Devon AD, Bennett owes a fiduciary duty of loyalty which carries with it the duty of care, duty of utmost loyalty, and duty of disclosure to Claret Nominees.

257.    Bennett negotiated and executed the 2008 Hosted Client Agreement without the consent, direction, or approval of Claret Nominees.

258.    After the May 8, 2008 meeting Board of Directors meeting where it was announced that IBM was seeking to restructure the Hosted Client Agreement, Bennett held no formal Board of Directors meetings or shareholders meetings to discuss the status of these negotiations.

259.    From May through June 2008, Kane repeatedly made requests to Bennett for documentation evidencing the status of Bennett's negotiations with IBM, all of which were refused.

260.    Throughout May and June 2008, Kane requested to be included in the renegotiation of the Blade Agreement on behalf of Claret Nominees, and was prohibited from doing so by Bennett.

261.    Bennett held no vote to determine whether Devon AD should pursue the negotiations with IBM or whether Devon AD should execute the 2008 Hosted Client Agreement.

262.    Bennett adopted no Board Resolutions that were shared with Claret Nominees that described these material decisions affecting Claret Nominees and Devon AD.

263.    Because Devon IT is the only entity that benefits from the 2008 Hosted Client Agreement, and Bennett is the principal stockholder of Devon IT, Bennett put his own self-interests above those of the minority shareholders.

264.    The 2008 Hosted Client Agreement was structured against Claret Nominees' interests because it ensures not only that Claret Nominees will receive no benefits as a minority stockholder but also that the loans made to Devon AD by Shiraz Ltd. cannot be repaid because there is no longer revenue flowing into Devon AD.

265.    By failing to disclose the terms of the termination of the Original Hosted Client Agreement or the material terms of the 2008 Hosted Client Agreement, breached his fiduciary duty to Claret Nominees.

266.    By entering into a material and onerous agreement without holding shareholder meetings, obtaining shareholder approval, or otherwise consulting with the shareholders of Devon AD, Bennett breached his fiduciary duty to Claret Nominees.

267.    By entering into the 2008 Hosted Client Agreement, which harmed the interests of Claret Nominees and Devon AD, Bennett breached his fiduciary duty to Claret Nominees.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

a.    entry of a declaratory judgment declaring all funds provided by IBM under the 2008 Hosted Client Agreement are the property of Devon AD;

b.       entry of judgment against Bennett and Makoid awarding Claret Nominees a constructive trust over the profits Bennett and/or Devon IT gained as a result of Bennett and Makoid's breach of fiduciary duties;

c.       entry of judgment against Bennett awarding Claret Nominees compensatory damages in an amount to be determined at trial;

d.       entry of judgment against Bennett awarding Claret Nominees punitive damages in an amount to be determined at trial;

e.       entry of judgment against Bennett awarding Claret Nominees reasonable attorney's fees, costs and interest; and

f.       entry of judgment against Bennett awarding Claret Nominees such other and further relief as this Court deems just and proper.

## COUNT FOURTEEN

### (MINORITY SHAREHOLDER OPPRESSION)

### (Claret Nominees v. Bennett and Makoid)

268.    Claret Nominees repeats and realleges the foregoing allegations as if set forth at length herein.

269.    Claret Nominees is a minority shareholder in Devon AD.

270.    Bennett is a majority shareholder in Devon AD.

271.    Bennett and Makoid are directors of Devon AD.

272.    When Claret Nominees committed its capital and made loans to Devon AD, it was with the reasonable expectation that the investment would be profitable and the loans would be repaid because of the existence of the original Hosted Client Agreement.

273.    If Claret Nominees had known that Bennett and Makoid intended to unilaterally terminate the Original Hosted Client Agreement before Claret Nominees received a

return on its investment or repayment of the loans, Claret Nominees would not have committed its capital to Devon AD at the outset.

274.   The 2008 Hosted Client Agreement violates Claret Nominees's reasonable expectations as a minority shareholder because it terminates benefits that belonged to Devon Europe and grants benefits to Devon IT.

275.   By structuring the 2008 Hosted Client Agreement so that only Devon IT receives royalties, Bennett and Makoid abused their discretion as controlling shareholders and directors.

276.   Bennett's and Makoid's conduct with respect to the 2008 Hosted Client Agreement is a visible departure from the standards of fair dealing and fair play.

277.   The foregoing allegations constitute a violation of common law and statutory law including the 15 Pa.C.S. § 1767.

WHEREFORE, Claret Nominees respectfully requests that the Court grant it the following relief:

      a.   entry of judgment against Bennett awarding Claret Nominees compensatory damages in an amount to be determined at trial;

      b.   entry of judgment against Bennett awarding Claret Nominees punitive damages in an amount to be determined at trial;

      c.   entry of judgment against Bennett awarding Claret Nominees reasonable attorney's fees, costs and interest; and

      d.   entry of judgment against Bennett awarding Claret Nominees such other and further relief as this Court deems just and proper.

89888908 v8

Dated:  July 31, 2008

_____

Matthew H. Adler [56373]
Jeremy Heep [75607]
Deirdre McInerney [200089]
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel:  215.981.4000

Attorneys for Plaintiffs Claret Capital Blade, Ltd.
and Claret Capital Nominees, Ltd.

#9888908 v8